No. 53,186

HENRIETTA HENDRIX, FOR HERSELF AND FOR AND ON BEHALF OF ALL
HEIRS AT LAW OF HAROLD JERMINE SMITH, AND THOMAS J. LEISING,
ADMINISTRATOR OF THE ESTATE OF HAROLD JERMINE SMITH, *Appellants,* v. CITY OF TOPEKA, KANSAS; R. MARTIN, #906; TOPEKA
POLICE DEPARTMENT; ROBERT HARDER; TOPEKA STATE HOSPITAL;
THE STATE OF KANSAS; AND DR. A., *Appellees.*

(643 P.2d 129)

Opinion filed
April 3, 1982.

*Patricia E. Riley,* of Ralston, Frieden & Weathers, P.A., of Topeka, argued the
cause and *Eugene B. Ralston,* of the same firm, was with her on the briefs for
appellants.

*Charles V. Hamm* and *Donald A. Frigon,* attorneys for the State Department of

Social and Rehabilitation Services, and *Reid Stacey,* assistant attorney general, argued the cause; and *Hal E. DesJardins,* attorney for the State Department of Social and Rehabilitation Services, and *Robert T. Stephan,* attorney general, were on the joint brief for appellees Robert C. Harder, Topeka State Hospital and the State of Kansas.

*Leonard M. Robinson,* deputy city attorney, argued the cause and was on the brief for appellees City of Topeka, Officer Martin and Topeka Police Department.

The opinion of the court was delivered by

McFarland, J.: The heirs and administrator of the estate of Harold Jermine Smith appeal the involuntary dismissal of their action which sought recovery for the wrongful death and injuries of the deceased. The basis of the dismissal was failure to state a cause of action upon which relief could be granted (K.S.A. 60-212[b]).

The petition filed herein alleges:

"9. That prior to December 30, 1978, plaintiffs' deceased had been a patient at Topeka State Hospital. That on or about the 30th day of December, 1978, plaintiffs' deceased requested admission to Topeka State Hospital. That plaintiffs' deceased was refused admission to Topeka State Hospital. That subsequently plaintiffs' deceased was removed from the grounds of Topeka State Hospital, at the request of said hospital and its agent Dr. A, by defendant R. Martin, an officer of Topeka Police Department, an agency of the City of Topeka. Subsequent thereto plaintiffs' deceased was found frozen to death in a bus at Gage Park. That deceased suffered pain.

"10. That the actions of the defendants and each of them constitute negligence, which negligence was the proximate cause of plaintiffs' damages."

This action was filed November 17, 1980. One group of defendants was dismissed from the action on April 3, 1981, with the balance of the defendants being dismissed on June 19, 1981. The plaintiffs' appeal was timely filed.

The first issue is whether the trial court erred in applying the Kansas Tort Claims Act (K.S.A. 1981 Supp. 75-6101 *et seq.*) prospectively.

The death of the decedent occurred on or about December 30, 1978. At this point in time both the state and municipality had immunity from any tort liability therefor, pursuant to K.S.A. 46-901 *et seq.* [repealed L. 1979, ch. 186 § 33, July 1].

Contemporaneous with the repeal of the governmental immunity statute was the passage of the Kansas Tort Claims Act, K.S.A. 1981 Supp. 75-6101 *et seq.* The act provides:

"(b) The Kansas tort claims act shall be applicable to claims arising from acts or omissions occurring on and after the effective date of this act."

The effective date of the act was July 1, 1979.

By its own statutory language, the act was to operate only prospectively.

The plaintiffs argue that prospective application of the Tort Claims Act, so as to exclude claims arising before July 1, 1979, creates a classification of claims arising before the date for which no remedy is available. They maintain that this classification is discriminatory and unsupportable under the holding in *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 596 P.2d 446 (1979).

In *Flax*, the court held K.S.A. 46-901 unconstitutional when applied to the Kansas Turnpike Authority for highway defects as creating a class of motorists who are subjected to invidious discrimination in violation of the equal protection clauses of the federal and state constitutions.

In reaching this conclusion, the rationale of the court can be seen in the following:

"In the present case, the inconsistency in the application of the doctrine, as now established by legislative action rather than judicial fiat, reaches the ultimate in its discrimination against one small segment of the motoring public. Let us assume Jeanette Flax had entered Kansas coming from Denver, Colorado, on Interstate 70 with a destination of Kansas City. She, and her family, would have been protected from highway defects for over three-fourths of her journey in Kansas. Suddenly, by passing through Topeka and the turnpike tollgate, she loses her protection for the remaining few miles of her journey without ever leaving the same highway. Damage caused by a highway defect five miles west of Topeka would be compensable while the same damage on the same highway from a similar defect five miles east of Topeka would not." 226 Kan. at pp. 7-8.

In addition, the court looked to the statutory remedy provided in highway defect cases:

"In K.S.A. 1978 Supp. 68-419, allowing recovery from the state for highway defects, the legislature has set forth a detailed procedure to be followed in presenting a claim against the state through the department of transportation. Unfortunately, no such procedure has been established for claims against the KTA and it is not the function of this court to establish such a procedure. Having determined that K.S.A. 46-901 is unconstitutional when applied to the KTA in a turnpike defect case, plaintiff is free to pursue her action as in any other civil case." 226 Kan. at pp. 11-12.

K.S.A. 46-901 was held to be unconstitutional only when applied to turnpike defect cases.

The plaintiffs try to fit the present situation into *Flax* by pointing out that under the Tort Claims Act, the state may be liable for damages or injuries suffered by a person on July 1, 1979,

but not for injuries suffered by the same person on June 30, 1979, or, as herein, for injuries suffered on December 30, 1978.

*Flax,* however, is readily distinguishable from the situation herein. In the *Flax* case the constitutional problem arose because motorists using the regular state highway could recover for injuries caused by highway defects while motorists using one particular highway, the Kansas Turnpike, were denied recovery. At the same point in time some motorists had rights denied other motorists. In the case before us, there is no discriminatory classification because all persons in like circumstances are, at any given point in time, treated the same.

In essence, the plaintiffs are contending that the Legislature does not have the authority to determine *when* a particular act will take effect. The Tort Claims Act, by its express language, is to apply to claims arising from acts or omissions occurring on or after July 1, 1979. The legislative intent is clear—the act is to be applied prospectively.

Even in the absence of such a definite statement of legislative intent, the court has consistently held that a statute does not operate retroactively, but only prospectively, unless the intention of the legislature is clearly expressed by the statute that its provisions are to be applied retrospectively. *Thome v. City of Newton,* 229 Kan. 375, Syl. ¶ 6, 624 P.2d 454 (1981); *American State Bank v. White,* 217 Kan. 78, Syl. ¶ 5, 535 P.2d 424 (1975).

In the case of *State v. Dumler,* 221 Kan. 386, 391, 559 P.2d 798 (1977), the court acknowledged the legislature's power to determine the effective date of a statutory enactment. The designation of the time in which a statute will take effect is an inherent legislative power.

In exercising its vested authority to determine the effective date of the Tort Claims Act, the Legislature did no more than what was done by this court in *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969). There, the court abolished judicially imposed governmental immunity and made the decision prospective in effect. The court stated at pp. 851-852:

"There remains the consideration of the time when the abrogation of the immunity as herein stated shall take effect. We are of the opinion that reasonable time should be given the various public bodies to meet the new liabilities implicit in this decision. We find ample authority for the proposition that in departing from the rule of *stare decisis,* the court may restrict application of a newly established rule to the instant case, and cases arising in the future, where it is clear

that the retrospective application of the new rule will result in a hardship to those who have relied upon prior decisions of the court. (See *Molitor v. Kaneland Com. Unit Dist.*, 18 Ill. 2d 11, 163 N.E.2d 89; *Holytz v. City of Milwaukee*, 17 Wis. (2d) 26, 115 N.W. 2d 618, and cases cited therein.)

"Except for the instant case, the effective date of the abolition of the rule of governmental immunity as applied to proprietary enterprises shall be August 30, 1969. Except for the instant case the new rule shall not apply to torts occurring prior to August 30, 1969. In applying the new rule to the instant case we are impressed with what was said in *Molitor v. Kaneland Com. Unit Dist.*, supra. We quote:

" ' . . . At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere *dictum*. Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in challenging the old rule which we now declare erroneous. Thus, there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it.

" 'It is within our inherent power as the highest court of this State to give a decision prospective or retrospective application without offending constitutional principles. *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 77 L.Ed. 360.' (p. 28.)"

We conclude the trial court did not err in: (1) upholding the legislatively mandated prospective application of the Kansas Tort Claims Act; and (2) dismissing the action as to the governmental entities herein on the grounds of governmental immunity.

The next issue is the propriety of the dismissal from the action of Dr. Robert Harder. The reasoning of the trial court was as follows:

"5. [T]he immunity granted by K.S.A. 46-901 does not apply to individuals acting as public officers of the State of Kansas. *Kern v. Miller*, 216 Kan 724, 533 P.2d 1244 (1975). Under common law public officers, when performing the duties imposed upon them by statute and exercising in good faith the necessary judgment and discretion, are not liable personally in damages to private individuals resulting as a consequence of their official acts. *Kern, supra; Gresty v. Darby*, 146 Kan 63, 68 P.2d 649 (1937).

"6. Defendant Robert E. Harder as Secretary of Social and Rehabilitation Services of the State of Kansas is entrusted with the enforcement of laws relating to mentally ill persons of this state by authority of K.S.A. 1980 Supp. 75-3307b.

"7. In *Gresty v. Darby*, supra, the Kansas Supreme Court noted the plaintiff, in an action to recover from state officials as individuals, did not allege actions done by the officials were without the scope of their statutory authority or that they acted through malice, or corruptly, or capriciously. The Court said in the absence of such allegations the plaintiff's petition failed to state facts sufficient to constitute a cause of action.

"8. The Plaintiff in her petition does not allege any specific acts of Robert E.

Harder which were done outside the scope of his statutory authority as Secretary of Social and Rehabilitation Services or that he acted with malice, or corruptly, or capriciously. Further, plaintiff does not allege Robert E. Harder acted without exercising good faith and discretion. Plaintiff has therefore failed to state facts sufficient to constitute a cause of action."

We agree with the trial court. Public officials have what is sometimes referred to as partial immunity. This is, however, a misleading term. Where applicable, the common law immunity of a public official is just as complete a bar to action as any other type of immunity. Under such circumstances, even with the advent of notice pleading, it is incumbent upon a person asserting a claim against a public officer to make at least some allegation which, if true, would tend to establish that immunity was not a bar to the claim. This requirement, of course, is limited to complained of acts and omissions arising at least under color of the official duties of the public officer as opposed to purely private matters.

This conclusion is in harmony with *Kern v. Miller*, 216 Kan. 724, cited by the trial court. In *Kern* this court said:

"As a general rule it has been stated that public officers, when performing the duties imposed upon them by statute and exercising in good faith the judgment and discretion necessary therefor, are not liable personally in damages for injuries to private individuals resulting as a consequence of their official acts. (*Gresty v. Darby*, 146 Kan. 63, 68 P.2d 649; *Tillotson v. Fair*, 160 Kan. 81, 159 P.2d 471.) As plaintiffs point out, however, this general rule of immunity is limited to acts performed within their jurisdiction. If public officers act outside the scope of their authority they may be held liable for damages resulting from their acts. (*Cunningham v. Blythe*, 155 Kan. 689, 127 P.2d 489; *Tillotson v. Fair*, supra.)

"Plaintiffs' petition specifically alleges all four defendants were 'acting outside the scope of the duties' of the attorney general when they entered into the contract to take over the plaintiffs' business. The determination of the issue of scope of authority should follow the fact-finding procedures in the trial court." pp. 728-729

See also *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 494, 630 P.2d 186 (1981), which states:

"Even assuming arguendo that such immunity did exist, that immunity would not extend to the individual defendants based upon the allegations of plaintiff's petition. The common-law rule recognized an exception to the immunity of public officers:

" 'The immunity of the sovereign from suit does not protect public officers from personal liability for their wrongful acts in excess of their official authority . . . since the acts of officials which are not legally authorized or which exceed or abuse their authority or discretion are not acts of the state . . . .' 72 Am. Jur. 2d, States, Etc. § 115, p. 504.

"This exception has been recognized in Kansas in cases holding that officers were not liable 'in the absence of malice,' *Kretchmar v. City of Atchison,* 133 Kan. 198, 204, 299 Pac. 621 (1931); 'in the absence of malice, oppression in office or willful misconduct,' *Hicks v. Davis,* 100 Kan. 4, Syl., 163 Pac. 799 (1917); for acts unless 'wholly outside their jurisdiction,' *Evans v. Marsh,* 158 Kan. 43, 47, 145 P.2d 140 (1944); or 'in the absence of malice, oppression, wantonness, or willful misconduct,' *Commercial Union Ins. Co. v. City of Wichita,* 217 Kan. 44, Syl. ¶ 7, 536 P.2d 54 (1975).

"It is not for this court to determine whether the individual defendants have been guilty of any of the exceptions noted above. Plaintiff has, however, alleged willful and wanton misconduct and the allegations of his petition, on a motion to dismiss, must be taken in the light most favorable to him. The question always for the trial court's determination is 'whether in the light most favorable to plaintiff, and with every doubt resolved in his favor, the petition states any valid claim for relief.' "

In their brief, plaintiffs concede:

"Robert Harder, secretary of the Kansas Department of Social and Rehabilitation Services, was made a party to this action because Topeka State Hospital, the central institution involved in this litigation, is under the jurisdiction of the Department of Social and Rehabilitation Services."

Dr. Harder, then, was made a defendant solely because of the statutory duties imposed by the public office he holds. For the sake of convenience, the pertinent portions of the petition are repeated herein:

"9. That prior to December 30, 1978, plaintiffs' deceased had been a patient at Topeka State Hospital. That on or about the 30th day of December, 1978, plaintiffs' deceased requested admission to Topeka State Hospital. That plaintiffs' deceased was refused admission to Topeka State Hospital. That subsequently plaintiffs' deceased was removed from the grounds of Topeka State Hospital, at the request of said hospital and its agent Dr. A, by defendant R. Martin, an officer of Topeka Police Department, an agency of the City of Topeka. Subsequent thereto plaintiffs' deceased was found frozen to death in a bus at Gage Park. That deceased suffered pain,

"10. That the actions of the defendants and each of them constitute negligence, which negligence was the proximate cause of plaintiffs' damages."

We conclude that the trial court did not err in concluding the plaintiffs had failed to state a cause of action against defendant Harder.

The final issue on appeal is the propriety of the order of dismissal entered in favor of police officer R. Martin. The allegations in the petition relative to all the defendants are set forth in each of the preceding issues and will not be repeated. It is agreed that Officer Martin was acting in his official capacity when he

responded to the hospital's call and removed the decedent from the premises. Officer Martin is a public officer and, as such, the general legal principles relative to a public officer's common law immunity set forth in the preceeding issue concerning defendant Harder are equally applicable to this defendant.

By virtue of the nature of a police officer's duties and the vast exposure to liability police work entails, some refinements of the basic rules have occurred. Broadly speaking, a police officer has immunity from liability on claims by individuals arising from the performance or nonperformance of an officer's general duties such as enforcement of law and crime prevention. Liability arises only where an officer breaches a specific duty owed to an individual. Put another way, an officer must owe an affirmative duty to an individual before he may be held liable.

This concept was explored in some depth in *Commercial Union Ins. Co. v. City of Wichita,* 217 Kan. 44, 53-54, 536 P.2d 54 (1975). The action therein arose out of the firebombing of a store. Recovery was sought against a police detective for failure to disperse an unlawful assembly as defined by K.S.A. 21-1001 and -1002, since repealed. This court, in upholding the detective's dismissal, reasoned as follows:

"As to Detective Lux, plaintiffs argue that he breached his duty under 21-1002 to order the dispersal of the four boys in front of the Gentry Shop, and that such a breach of a statutory duty made him personally liable for the ensuing damage. It was therefore error, they say, to grant his motion for summary judgment. There is no merit to this contention.

"The statute amounts to a codification of the common law duty of a peace officer to preserve the peace. The duty owed is to the public at large, and not to any particular individual. For the breach of such duty an officer is answerable only to the public acting through its official representatives, and not to any particular individual. Speaking of a sheriff, the original conservator of the peace under the common law, the United States Supreme Court said in 1856:

" 'It is an undisputed principle of the common law, that for a breach of a public duty, an officer is punishable by indictment; but where he acts ministerially, and is bound to render certain services to individuals, for a compensation in fees or salary, he is liable for acts of misfeasance or nonfeasance to the party who is injured by them.

" 'The powers and duties of conservator of the peace exercised by the sheriff are not strictly judicial; but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace. It is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only.

" 'The history of the law for centuries proves this to be the case. Actions against the sheriff for a breach of his ministerial duties in the execution of process are to

be found in almost every book of reports. But no instance can be found where a civil action has been sustained against him for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of mobs, riots, or insurrections.' (*South et al. v. State of Maryland, Use of Pottle,* 59 U.S. [18 How.] 396, 402-3, 15 L.Ed. 433.)"

"The rule appears to have been universally followed, in the absence of a constitutional or statutory provision imposing liability. See Anno., *Police-Personal Liability,* 41 A.L.R. 3d 700, and especially § 4, '*Injuries from riots and mob violence.*'

"Our own rule is that 'executive officers are not liable for errors in the performance of duties involving discretion and judgment, in the absence of malice, oppression in office or willful misconduct.' (*Hicks v. Davis,* 100 Kan. 4, 163 Pac. 799, Syl. See also, *Evans v. Marsh,* 158 Kan. 43, 145 P.2d 140; *City of Hutchinson v. Hutchinson, Office of State Employment Service,* [213 Kan. 399, 517 P.2d 117]. And cf., *Gardner v. McDowell,* 202 Kan. 705, 451 P.2d 501, where the element of 'wantonness' was included.) No malice, oppression, wantonness or willful misconduct was asserted against this policeman."

Liability against a police officer may be predicated upon breach of specific promises or representations such as failure to provide promised protection to an informant. See *Schuster v. City of New York,* 5 N.Y.2d 75, 154 N.E.2d 534 (1958).

The most common class of situations wherein it has been determined an officer breached a specific duty owed an individual involves excessive use of force in making an arrest or against a person in custody.

Under the facts as pled, the decedent was denied admission to Topeka State Hospital by the unnamed Dr. A. The hospital called upon the police department to remove the deceased. It is the theory of plaintiffs that the police officer had some unspecified duty toward the deceased which he breached.

What were the officer's options? The Kansas Legislature has, in the name of improving patient's rights, sharply limited a police officer's options relative to mentally ill persons.

A mentally ill person is defined by K.S.A. 1981 Supp. 59-2902 as follows in relevant part:

"(1) The term 'mentally ill person' shall mean any person who is mentally impaired to the extent that such person is in need of treatment and who is dangerous to himself or herself or others and

"(a) who lacks sufficient understanding or capacity to make responsible decisions with respect to his or her need for treatment, or . . . ."

If a police officer believes an individual may be a mentally ill person, *i.e.,* a person in need of psychiatric treatment and a danger to himself or others, a statute specifies what the officer

may do. That statute is K.S.A. 1981 Supp. 59-2908 which provides in relevant part:

"(a) Any peace officer who has reasonable belief upon observation, that any person is a mentally ill person and because of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty may take such person into custody without a warrant. Said officer shall transport such person to any treatment facility where such person shall be examined by a physician on duty at such facility. If no physician is on duty at the time such person is transported to the facility, such examination shall be made within a reasonable time not to exceed seventeen (17) hours. If a written statement is made by such physician at the treatment facility that after preliminary examination such physician believes such person to be a mentally ill person and because of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty, and if such treatment facility is willing to admit such person the peace officer shall present to such treatment facility the application provided for in subsection (b) of K.S.A. 1978 Supp. 59-2909. *If the physician on duty at the treatment facility does not believe such person to be a mentally ill person, the peace officer shall release such person.*" Emphasis supplied.

The facts pled by the petition show that the physician (Dr. A) on duty at the treatment facility had already determined that such person was not in need of admission and hence not a mentally ill person who was a danger to himself. Under the circumstances pled herein, the officer could not have a duty to override the statute and the physician's expert opinion as to deceased's mental condition and ability to care for himself. The officer had no option of keeping the man in custody. The decedent had no right to be arrested. We take judicial notice of the fact Topeka State Hospital and Gage Park are situated in relatively close proximity to each other and within the Topeka city limits. There is, accordingly, no inference decedent was transported to a remote area and left helpless by the officer.

The trial court, after discussing a police officer's public duty, reasoned as follows:

"8. The public duty, however, may be narrowed, becoming a special duty owed to an individual. The breach of that special duty may give rise to an action for negligence. Such a special duty arises in two circumstances: 1) where there is an affirmative act by the officer causing injury; and 2) when a specific promise or representation by the police is made under circumstances creating justifiable reliance. *McGeorge v. City of Phoenix,* 572 P.2d 100, 105 (Ariz. 1977); *Doe v. Hendricks,* 590 P.2d 647 (N.M. App. 1979).

"9. Examples of situations within the first category are placing an individual under arrest or committing an assault. *City of Tampa v. Davis,* 226 So.2d 450, 453 (Fla. App. 1969); *Crouch v. Hall,* 406 N.E.2d 303 (Ind. App. 1980). A line of Kansas cases which recognize that an officer is liable for false arrest or the

unnecessary use of force lends support to the existence of a special duty arising from such affirmative acts. *Bradford v. Mahan*, 219 Kan. 450, 548 P.2d 1223 (1979); *Gardner v. McDowell*, 202 Kan. 705, 451 P.2d 501 (1969); *Bukaty v. Berglund*, 179 Kan. 259, 294 P.2d 228 (1956).

"10. The second category, a special duty arising from specific promises or representations, is demonstrated by *Schuster v. City of New York*, 154 N.E.2d 534 (N.Y. 1958). There the court held that a special duty existed to protect an individual who had assisted the police in the identification of a suspect and there was evidence that the individual was in danger as a result of that assistance.

"11. In the present case the plaintiff has not alleged that the officer committed any affirmative act causing the death of plaintiff's deceased. Nor are there allegations of any specific promises or representations. Thus there was no special duty owed to the deceased."

We agree. A police officer is not an insurer against all harm for the people with whom he has official contact. Just as with defendant Harder, the plaintiffs had a duty to make at least some allegation which tended to establish that the breach of some special duty owed decedent caused or contributed to his death and thereby render the officer's common law immunity inapplicable.

The judgment is affirmed.